F I L E D
United States Court of Appeals
Tenth Circuit

MAY 14 1999

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

KENNETH D. HARDMAN and
MICHELLE HARDMAN,

     Plaintiffs-Appellants,

v.

SPECIALTY SERVICES, a
Washington Corporation; IKE
LOBATO, dba Specialty Services,

     Defendants,

SHEA-KIEWIT-KENNY, a joint
venture of J.F. Shea Co., Inc., a
Nevada Corporation; KIEWIT
CONSTRUCTION COMPANY, a
Delaware Corporation, both in their
capacities as individual entities, and as
participants in the above joint venture;
and KENNY CONSTRUCTION
COMPANY, an Illinois Corporation;
both in their capacities as individual
entities, and as participants in the
above joint venture,

     Defendants-Third-Party-
     Plaintiffs-Appellees,

v.

MOUNTAIN STATES STEEL, INC.,
a Utah corporation,

     Third-Party Defendant.

No. 97-4116

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 95-CV-180-C)**

Vicki E. Rinne, (Lynn C. Harris with her on the brief), of Spence, Moriarity & Schuster, Provo, Utah, for Plaintiffs-Appellants.

Karra J. Porter (Jay E. Jensen and Geoffrey C. Haslam with her on the brief), of Christensen & Jensen, P.C., Salt Lake City, Utah, for Defendants-Appellees.

Before **EBEL** and **BRISCOE**, Circuit Judges, and **MARTEN**,[*] District Judge.

**EBEL**, Circuit Judge.

Kenneth P. Hardman ("Hardman") and his wife Michelle Hardman sued Shea-Kiewit-Kenny ("SKK") in tort for injuries incurred by Hardman while working at Mountain States Steel ("MSS") on a project for SKK. The district court granted summary judgment to SKK on the ground that SKK was a special employer under the loaned-employee doctrine, and hence was immune from suit under the Utah Workers' Compensation Act ("Act"). The Hardmans appeal. We reverse.

---

[*]The Honorable J. Thomas Marten, District Judge, United States District Court for the District of Kansas, sitting by designation.

## BACKGROUND

In 1991, J.F. Shea Co., Inc., Kiewit Construction Company, and Kenny Construction Company of Illinois entered into a joint venture known as Shea-Kiewit-Kenny to build and assemble tunnel boring machines for SKK's use in a tunneling project in Los Angeles. In 1992, SKK and MSS entered into a written agreement whereby MSS would provide shop space, workers, equipment, and other services to SKK for the building of the tunnel boring machines. In return, SKK would pay an hourly rate for each worker MSS provided. The agreement specified that this rate covered all compensation, taxes, insurance, and benefits. The agreement also required MSS to provide SKK with certificates verifying that it had obtained workers' compensation insurance for those workers. Additionally, the agreement specified the roles of SKK and MSS in the project. SKK had the right to quality control supervision, and was responsible for general mechanical and electrical supervision. While all workers were to be screened and hired by MSS, the workers' performance and acceptability would be at the sole discretion of SKK.

Among the SKK employees primarily responsible for the tunnel boring project was Rick Cook, the graveyard-shift foreman. Among the MSS-hired

employees working on the project were Rick Thatcher, a lead man, Wade Opfar, a welder and fitter, and Hardman, also a welder and fitter.

On May 8, 1993, Cook told Thatcher that he wanted him, Opfar, and Hardman to help him trim a hydraulic door on one of the tunnel borers so that it would close properly. Thatcher then instructed Opfar and Hardman to build a scaffold and use it as a platform to trim the door. Hardman and Opfar completed their work with only Cook providing supervision and instruction. In testing the door, Cook accidentally pressed a lever which controlled another door, one near where Hardman was standing. That door swung inward, struck Hardman, and knocked him off the scaffold, causing him to fall against stairs and equipment and land on the floor. As a result of the accident, Hardman suffered injuries which still linger. Hardman's resulting medical expenses and other workers' compensation benefits were paid under MSS' workers' compensation policy.

On January 29, 1995, Hardman and his wife brought this diversity action against SKK and the individual participants in the joint venture (collectively, "SKK"), alleging negligence, infliction of emotional distress, and loss of consortium. SKK answered and filed a third-party action against MSS for indemnification. On January 17, 1997, after the completion of discovery, SKK moved for summary judgment, arguing that Hardman was a loaned employee and therefore that it was a special employer immune from tort liability under the Utah

Workers' Compensation Act.  The Hardmans filed a cross-motion for partial summary judgment on the ground that SKK was actually a general contractor and thus a statutory employer liable in tort.  The district court entered summary judgment in favor of SKK, finding as a matter of law that SKK was Hardman's special employer, and therefore entitled to immunity under the exclusive remedy provision of the Act.  The Hardmans filed a timely notice of appeal under Fed. R. App. P. 4(a).

## DISCUSSION

"We review the grant or denial of summary judgment de novo, applying the same standards as the district court."  Habermehl v. Potter, 153 F.3d 1137, 1138 (10th Cir. 1998).  Thus, "[s]ummary judgment is appropriate if the evidence before the court, when viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law."  Id. at 1139; see also Fed. R. Civ. P. 56(c).

## I.  The Loaned-Employee Doctrine

On appeal, the Hardmans assert that genuine issues of material fact exist concerning whether SKK was a special employer under the loaned-employee

doctrine. We agree and hold that SKK was not entitled to summary judgment on the ground that it was a special employer immune from suit under the loaned-employee doctrine.

Under Utah law, the loaned-employee doctrine "provides that if a labor service loans an employee to a special employer for the performance of work, then the employee, with respect to that work, is the employee of the special employer for whom the work or service is performed." Ghersi v. Salazar, 883 P.2d 1352, 1356 (Utah 1994). A special employer is the business to which the employee is assigned, while the labor service providing the employee is the general employer. See id. For purposes of workers' compensation, the special employer is the loaned employee's employer. See id. Under Utah Code Ann. § 35-1-60, workers' compensation is an employee's exclusive remedy against his or her employer for injuries sustained on the job. See Ghersi, 883 P.2d at 1354.[1]

_____

[1]The statute provides, in relevant part:

> (1) The right to recover compensation pursuant to the provisions of this title for injuries sustained by an employee, whether resulting in death or not, shall be the exclusive remedy against the employer . . . and the liabilities of the employer imposed by this act shall be in place of any and all other civil liability whatsoever, at common law or otherwise, to the employee or to his spouse . . . on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of his employment, and no action at law may be maintained against an employer . . . based upon any accident,
> (continued...)

- 6 -

Thus, under the loaned-employee doctrine, a special employer is immune from suit for employer injuries sustained on the job if it pays workers' compensation insurance for the loaned employee. See id. at 1358.

The loaned employee doctrine is triggered when three requirements are met: "(a) the employee has made a contract of hire, express or implied, with the special employer; (b) the work being done is essentially that of the special employer; and (c) the special employer has the right to control the details of the work." Id. at 1356-57 (quoting 1B Arthur Larson, Workers' Compensation Law § 48.00, at 8-434 (1992)).

Before we can analyze whether the loaned-employee test is satisfied in this case, we first must decide the threshold question of whether it is appropriate to apply the loaned-employee doctrine at all to the employment context of this case. The Hardmans contend that Hardman cannot be a loaned employee on the ground that MSS cannot be a general employer because, unlike companies described in Utah cases which apply the doctrine, MSS performs work for its own customers. In essence, the Hardmans argue that the loaned-employee doctrine should be limited to cases involving temporary help agencies.

---

[1](...continued)
injury, or death of an employee.

Utah Code Ann. § 35-1-60 (1993) (renumbered § 35A-3-105, effective July 1, 1997).

We disagree. While several Utah cases do discuss and apply the loaned-employee doctrine in the context of temporary help agencies, see, e.g., Kunz v. Beneficial Temporaries, 921 P.2d 456, 458 (Utah 1996); Walker v. U.S. General, 916 P.2d 903, 905 (Utah 1996); Ghersi, 883 P.2d at 1354, other loaned-employee cases involve general employers which were not temporary help agencies but rather companies that performed work for their own customers, see, e.g., Bambrough v. Bethers, 552 P.2d 1286, 1289 (Utah 1976); Pace v. Cummins Engine Co., Inc., 905 P.2d 308, 310 (Utah Ct. App. 1995). Indeed, Larson's Workers' Compensation Law, the treatise from which the Utah Supreme Court borrowed its three-prong test for the loaned-employee doctrine, see Ghersi, 883 P.2d at 1356-57, does not limit the concept of loaned employees to temporary help agencies, and in fact cites numerous cases where the general employer was not a temporary help agency. See 3 Larson, §§ 48.00-48.30, at 8-434 to 8-552. Thus, we conclude that the loaned-employee doctrine can apply to the employment context of this case even though MSS was not a temporary help agency. Consequently, we now turn to whether the three-prong test for the doctrine is in fact satisfied.

## II. Application of the Loaned-Employee Doctrine

After reviewing the record, we find the second and third prongs of the test for the loaned-employee doctrine—that the work done be essentially that of the special employer, and that the special employer have the right to control the details of the work—to be met without dispute. However, we find a genuine issue of material fact as to whether Hardman entered a contract of hire with SKK as required by the first prong of the test.

With regard to the second prong, the undisputed facts that Hardman was not hired for any other purpose than to work on SKK's project, that he worked only on the project, and that he was injured while working on the project, lead us to conclude that the work Hardman did was essentially that of SKK.

With regard to the third prong, the right to control, the Utah Supreme Court looks at whether the employer had the right to control details such as "where, when, and how the work is to be performed," Walker, 916 P.2d at 907, and also at whether the employer could discharge the employee for unsatisfactory performance. See Ghersi, 883 P.2d at 1357. It is undisputed from Hardman's own testimony that SKK foreman Cook was in charge of the night shift; from the testimony of MSS' general manager, Chris Olsen, that SKK decided which crews would work on the SKK project, as well as when and how the work would be done; and again from Olsen's testimony that SKK had 100 percent control over

the workers on the project. It is also undisputed that Cook had supervised Hardman and Opfar's work on the scaffolding and door, and that the SKK-MSS agreement gave SKK sole discretion over the performance and acceptability of all workers on the SKK project. From these undisputed facts, it is apparent that SKK had the right to control the details of Hardman's work.

However, with regard to the first prong of the test for the loaned-employee doctrine, the contract of hire prong, we find a genuine issue of material fact. Under the loaned-employee doctrine, a contract of hire "need not be express but may be inferred from the circumstances." See Walker, 916 P.2d at 906. "The critical determination is not whether [the employee] subjectively consented" to work for the special employer, "but rather whether he objectively manifested consent to the employment relationship." Id. "'Consent may be implied from the employee's acceptance of the special employer's control and direction.'" Pace, 905 P.2d at 310 (quoting 1B Larson, § 48.15, at 8-464). Obviously, an employee cannot accept the special employer's control and direction unless he or she knew or reasonably should have known that such control and direction comes from the special employer. Cf. Bambrough v. Bethers, 552 P.2d 1286, 1292 (Utah 1976) ("Consent, whether express or implied, was not possible . . . because it involved a second employer who was not known to exist by the employee."); 1B Larson, § 48.16, at 8-472 ("An employee, for compensation purposes, cannot have an

employer thrust upon him against his will or without his knowledge.").[2]  Since

Hardman never entered an express contract of hire with SKK, our inquiry turns to

whether he objectively manifested consent to an employment relationship with

SKK by accepting SKK's control and direction.  We find the record in dispute on

whether Hardman knew or reasonably should have known that he was accepting

SKK's control and direction while working on the SKK project.

On the one hand, certain facts indicate that Hardman impliedly accepted the

control and direction of SKK.  For example, although Hardman was hired

pursuant to the MSS-SKK agreement as an MSS employee, he actually may have

been interviewed and hired by SKK personnel.  Hardman at least knew when he

was hired that he would be working on the SKK project, and he worked only on

that project.  Hardman regarded his graveyard-shift foreman, SKK employee

Cook, as the person in charge of the project, and Hardman took orders from Cook

during the night of the accident.  Additionally, the area in which Hardman

---

[2]Of course, an employee's knowledge regarding the control and direction of the special employer is different from his subjective belief about his status as the special employer's employee.  An employee who knows or reasonably should know that he is accepting the control and direction of the special employer objectively manifests consent to the employment relationship with the special employer even if he does not believe that he is doing so.  See Walker v. U.S. General, Inc., 916 P.2d 903, 906 (1996); Pace, 905 P.2d at 310; cf. Bambrough, 552 P.2d at 1292.

worked, the north shop of the MSS facility, was leased out to SKK for its project, and was under SKK's control and direction.

On the other hand, certain facts in the record leave doubt as to whether Hardman himself knew or reasonably should have known that he was under the control and direction of SKK. Hardman had worked at MSS for less than two weeks before the accident, and apparently did not learn the nature or extent of SKK's role in his hiring or the supervision of the SKK project. Hardman thought that he was interviewed and hired by MSS employees, and that Cook was an MSS employee. Nothing in the record clearly indicates that Hardman knew or should have known otherwise. For instance, MSS general manager Olsen testified that he did not know whether the arrangement between MSS and SKK was specifically explained to Hardman and the other workers on the project; rather, Olsen thought "their understanding was that they had two or three bosses and they did whatever they were told by whoever told them up the chain of command." While Olsen thought that SKK employees had hard hats that had "SKK" on them, Cook testified that he did not wear any hard hat or uniform indicating that he worked for SKK. Additionally, there may have been a sign marking the SKK office at the MSS facility, but the record does not indicate whether Hardman should have seen the sign or understood from it the nature and extent of SKK's control over the project. Furthermore, there is no indication in the record that SKK had any signs

in the shop where Hardman worked to suggest that the shop was under SKK's supervision.

Based upon these facts, we cannot conclude as a matter of law that Hardman knew or reasonably should have known that he was accepting control and direction from SKK. As a result, we hold that there exists a genuine issue of material fact regarding whether Hardman objectively manifested consent to an employment relationship with SKK such that a contract of hire existed between them. Cf. Pace, 905 P.2d at 309 (finding employee objectively manifested consent to employment relationship with special employer where employee knowingly went over to special employer's facility to work on engine with special employer's "lead man on [the] job"). The first prong of the loaned-employee doctrine therefore could not have been satisfied at summary judgment. Accordingly, we hold that the district court erred in granting summary judgment to SKK on the basis of the loaned-employee doctrine.

## CONCLUSION

The district court's grant of summary judgment for SKK is REVERSED. The case is REMANDED for proceedings consistent with this opinion.

- 13 -